## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## NEWARK DIVISION

**WILLIAM MORALES, individually, and
on behalf of the Quest Diagnostics Profit
Sharing Plan,**

        **Plaintiff,**

**v.**

**QUEST DIAGNOSTICS INCORPORATED,**

        **Defendant.**
_____/

## CLASS ACTION COMPLAINT

1.      This action seeks to protect the retirement savings of more than 45,000

Quest Diagnostics Incorporated ("Defendant" or "Quest") employees who are

participants in the QUEST retirement plan, more commonly referred to as the Quest

Diagnostics Profit Sharing Plan ("Plan").

2.      Named Plaintiff, William Morales ("Plaintiff") brings this action on

behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce liability under 29

U.S.C. §1109(a), and to restore to the Plan all losses resulting from Quest's breaches

of fiduciary duty.

## JURISDICTION AND VENUE

3.      This Court has exclusive jurisdiction over the subject matter of this

action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action

under 29 U.S.C. §1132(a)(2) and (3).

4.      This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, and where at least one of the alleged breaches took place.

## ERISA

5.      The ERISA fiduciary duty of prudence is among "the highest known to the law" and requires fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As a fiduciary to the Plan, Quest is obligated to act for the exclusive benefit of the Plan and to ensure that the Plan's expenses are reasonable. *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

6.      "ERISA is a remedial statute designed to protect the interests of plan participants and beneficiaries….Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." *Degnan v. Publicker Industries, Inc*., 83 F.3d 27, 30 (1st Cir. 1996). This principal favors liberal construction of pleadings. *Fitzgerald v. Codex Corp*., 882 F.2d 586, 589 (1st Cir. 1989); *see also Jackson v. Truck Drivers' Union Local 42 Health & Welfare Fund*, 933 F. Supp. 1124, 1134

(D. Mass. 1996).

7.      While everyone who participates in a 401(k) plan pays fees to maintain their account, industry insiders report that over 70% of people do not believe they pay any fees. To help the public obtain a better grasp on fees they pay in retirement plans, the Department of Labor passed regulations in 2012 that require plan administrators to disclose fee and expense information to plan participants. However, most plan participants are still in the dark concerning the actual amount of fees they pay. The lack of understanding is not surprising. Often fees are hidden from plain view. In many cases, plan providers do not make the fee and expense disclosures that the Department of Labor requires.

8.      Such is the case here. The account statements that Quest provides to its Plan participants do not disclose the fees paid to third party service providers by Plan participants. In addition, the Plan's Annual Form 5500 Department of Labor reports are supposed to identify the fees paid to third parties, but as discussed below, they do not.

9.      Quest's fiduciary obligations with respect to the Plan are especially important because Plan participants cannot negotiate fees charged to Plan participants. Plan participants must trust that Quest will prudently do so. Quest is also responsible for selecting investments and hiring service providers for the plan. These fiduciary decisions have the potential to dramatically affect the amount of

money that participants can save for retirement. According to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1-2 (Aug. 2013).

10.    That is, if a person placed $25,000 in a retirement account, made no other contributions to the account for 35 years, averaged a 7% return for 35 years, and paid .5% in fees, the account balance will grow to $227,000. But if the fees are increased by just 1%, the 1% increase costs a staggering $64,000, or 28% of the retirement savings.

11.    Accordingly, Quest must engage in a rigorous process to control fees and ensure that Plan participants pay no more than a reasonable level of fees. This is particularly true for billion-dollar plans like the Plan here, which has the bargaining power to obtain the highest level of service and the lowest fees. The fees available to billion-dollar retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

12.    The entities that provide administrative services and investments to retirement plans have a strong incentive to maximize their fees. Each dollar in fees paid from participants' retirement savings reduce by the same amount participants' retirement savings, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is

directly affected by the diligence used by plan fiduciaries to control, negotiate, monitor, and reduce a plan's fees.

13.    Plan fiduciaries must be cognizant that self-interested third parties seek to maximize fees from plans, and fiduciaries may not simply accede to demands, or agree to quotes without negotiating or considering alternatives. To act in the exclusive interest of a Plan and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake.

## THE PLAN

14.    The Quest Diagnostics Profit Sharing Plan (formerly The Profit Sharing Plan of Quest Diagnostics Incorporated) (the "Plan") is a defined contribution plan.

15.    The Plan was established by Defendant, Quest Diagnostics Incorporated, which is the parent entity of a controlled group of corporations and other entities (the "Quest Control Group").

16.    The Plan provides retirement benefits to eligible employees of the Quest Control Group.

17.    The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

18.    Eligible employees can participate in the Plan as soon as administratively feasible upon becoming an employee of a member of the Quest Control Group.   Participants may contribute an amount between 1% and 35% of

their eligible compensation, as defined, for the contribution period.

19.     Participants immediately vest in their voluntary contributions and employer matching contributions plus actual earnings thereon. Certain participants who were active in plans sponsored by previous employers have vesting requirements applied to their previous employer contribution accounts consistent with the vesting requirements in effect before the assets were merged into the Plan.

20.     Defined contribution retirement plans, like the Plan here, are generally classified as follows: "Micro" plans (<$5 million in assets); "Small" plans ($5 million-<$50 million); "Mid" plans ($50 million-<$200 million); "Large" plans ($200 million-<$1 billion); and "Mega" plans (>$1 billion).

21.     As of December 31, 2021, the Plan had $5,665,588,484 in assets and 45,737 participants with account balances. Thus, the Plan qualifies as a "mega" plan in the 401(k) marketplace.

22.     Instead of leveraging the Plan's tremendous bargaining power to benefit Plan participants, Quest caused the Plan to pay unreasonable and excessive fees.

## THE PARTIES

23.     Plaintiff is a long-time employee of Quest, where he has worked since 2002.   Currently, he works as cytotechnologist, responsible for screening patients for cancer.  Plaintiff is currently enrolled in the Plan.

24.    Plaintiff has statutory standing to bring this action because 29 U.S. §1132(a)(1) allows a plan participant to file a civil action which seeks relief on behalf of a plan. Here, the Plan suffered millions of dollars in losses caused by Quest's fiduciary breaches. Plaintiff alleges that he and Plan participants suffered the same losses resulting from the ERISA violations committed by Quest as set forth herein. All relief in this action sought by the Plaintiff is sought on behalf of the Plan.

25.    To establish Constitutional standing (or Article III standing), the Plaintiff need only show a concrete and particularized injury flowing from Quest's ERISA fiduciary breaches. Plaintiff alleges his individual accounts in the Plan suffered losses because his account was assessed excessive fees, which would not have been incurred had Quest discharged its ERISA fiduciary duties to the Plan and ensured fees were reasonable. That money (millions of dollars) should have gone towards Plan participants' retirement; instead, it went elsewhere. Accordingly, Plaintiff has suffered concrete and particularized injuries.

26.    Plaintiff also has standing because he is seeking injunctive and equitable relief on behalf of the Plan, as identified in the Prayer for Relief.

## CLASS ACTION ALLEGATIONS

27.    Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the following proposed class ("Class"):

> All persons who were participants in or beneficiaries of the Quest Savings Plan, at any time between December 22, 2016, and the present

(the "Class Period").

28.     The members of the Class are so numerous that joinder is impractical. According to the Plan's Annual Form 5500 for the year ending 2021, filed with the U.S. Department of Labor, there were 45,737 Plan participants with account balances as of December 31, 2021.

29.     Plaintiff's claims are typical of Class members' claims. Like other Class members, Plaintiff participated in the Plan and suffered injuries because of Quest's ERISA fiduciary breaches. Quest treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and Class members' claims arise out of the same conduct, policies, and practices of Quest as alleged herein, and all members of the Class have been similarly affected by Quest's ERISA violations.

30.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A.     Whether Quest is a fiduciary of the Plan;

    B.     Whether Quest breached its fiduciary duty of prudence by engaging in the conduct described herein;

    C.     Whether Quest failed to prudently monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

    D.     Whether Quest caused the Plan to pay excessive fees for

investments;

    E.    The proper form of equitable and injunctive relief; and

    F.    The proper measure of relief.

31.    Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other Class members. Plaintiff is committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this action as a class action.

32.    This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Quest. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

33.    In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because Quest has acted or refused to act on grounds generally applicable

to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

### *Defendant Breached Its Fiduciary Duties by Selecting More Expensive Share Classes Instead of Low-Cost Institutional Shares of the Same Funds*

34.    The Supreme Court reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble v. Edison Int'l,* 575 U.S. 523, 529, 135 S. Ct. 1823, 1828, 191 L. Ed. 2d 795 (2015).

35.    In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act ("UPIA"), treatises, and seminal decisions confirming the duty.

36.    The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id.* § 2 comment.

37.    Under trust law, one of the responsibilities of the Plan's fiduciaries is

to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").

38.    Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

39.    As demonstrated by the chart below, in many instances during the Class Period (sixteen to be precise), Defendant failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost.

40.    The chart below uses 2022 expense ratios, the most recent data available, to demonstrate how much more expensive the share classes in the Plan are than available lower-cost share classes:

| Fund in Plan | Net Expense Ratio[1] | Lower Cost Share Class of Same Fund | Net Expense Ratio[2] |
|---|---|---|---|
| FSNJX Fidelity Freedom 2005 Fund Class K | 0.42% | FFGFX Fidelity Freedom Index 2005 Fund Institutional Premium Class | 0.08% |
| FSNKX Fidelity Freedom 2010 Fund Class K | 0.44% | FFWTX Fidelity Freedom Index 2010 Fund Institutional Premium Class | 0.08% |
| FSNLX Fidelity Freedom 2015 Fund Class K | 0.47% | FIWFX Fidelity Freedom Index 2015 Fund Institutional Premium Class | 0.08% |
| FSNOX Fidelity Freedom 2020 Fund Class K | 0.51% | FIWTX Fidelity Freedom Index 2020 Fund Institutional Premium Class | 0.08% |
| FSNPX Fidelity Freedom 2025 Fund Class K | 0.54% | FFEDX Fidelity Freedom Index 2025 Fund Institutional Premium Class | 0.08% |
| FSNQX Fidelity Freedom 2030 Fund Class K | 0.58% | FFEGX Fidelity Freedom Index 2030 Fund Institutional Premium Class | 0.08% |
| FSNUX Fidelity Freedom 2035 Fund Class K | 0.61% | FFEZX Fidelity Freedom Index 2035 Fund | 0.08% |

[1] As of January 2022.
[2] As of January 2022 .

| | | Institutional Premium Class | |
|---|---|---|---|
| FSNVX<br>Fidelity Freedom 2040 Fund Class K | **0.65%** | FFIZX<br>Fidelity Freedom Index 2040 Fund Institutional Premium Class | **0.08%** |
| FSNZX<br>Fidelity Freedom 2045 Fund Class K | **0.65%** | FFOLX<br>Fidelity Freedom Index 2045 Fund Institutional Premium Class | **0.08%** |
| FSNBX<br>Fidelity Freedom 2050 Fund Class K | **0.65%** | FFOPX<br>Fidelity Freedom Index 2050 Fund Institutional Premium Class | **0.08%** |
| FSNDX<br>Fidelity Freedom 2055 Fund Class K | **0.65%** | FFLDX<br>Fidelity Freedom Index 2055 Fund Institutional Premium Class | **0.08%** |
| FSNFX<br>Fidelity Freedom 2060 Fund Class K | **0.65%** | FFLEX<br>Fidelity Freedom Index 2060 Fund Institutional Premium Class | **0.08%** |
| FSNDX<br>Fidelity Freedom 2065 Fund Class K | **0.65%** | FFIKX<br>Fidelity Freedom Index 2065 Fund Institutional Premium Class | **0.08%** |
| MWELX<br>MFS Global Equity Fund Class R4 | **.88%** | MWEMX<br>MFS Global Equity Fund Class R6 | **.79%** |
| VTSNX<br><br>Vanguard Total | **0.08%** | VTPSX<br>Total International Stock Index Fund | **0.07%** |

| International Stock Index Fund Institutional Shares | | Institutional Plus SharesIndex 2005 Fund Institutional Premium Class | |
|---|---|---|---|
| VIEIX Vanguard Extended Market Index Fund Institutional Shares | **0.050%** | VEMPX Vanguard Extended Market Index Fund Institutional Plus Shares | **0.040%** |

41.    In fact, more than sixty percent (60%) of the Plan's investments are invested in the Fidelity Freedom Fund K Class Target Date funds which are, on average at least 55 basis higher than their less expensive Fidelity Freedom Index Fund Institutional Premium Class counterparts.

42.    As the charts above illustrate, throughout the Class Period Defendant should have known of the existence and availability of lower-cost share classes.

43.    Defendant's failure to disclose the options for the lowest-cost share class available caused Plan participants to pay excessive fees when they chose the higher-cost share class for the same funds, which has and will continue to diminish the value of their individual 401(k) accounts.

44.    A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into institutional shares at the earliest opportunity.

45.    Here, Defendant made the lower-cost share class of the Fidelity suite of target date retirement funds available to participants as of 2016, but left

participants' funds in the higher-cost share unless the participant took action to transfer the funds to the lower-cost share class.

46.     Despite the new availability of these lower-cost shares to the Quest participants in 2016 and the years since, upon information and belief, Defendant failed to transfer Plan holdings in any of these funds from higher-priced share classes into the lowest-cost institutional share classes, in breach of its fiduciary duties. Instead, Defendant left the participants' funds in the higher-cost share classes unless the participants elected to move to the newly available lower-cost share classes.

47.     A prudent fiduciary conducting an impartial review of the Plan's investments on a monthly, quarterly, or at least an annual basis, would have easily identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into institutional shares at the earliest opportunity. Yet, despite the availability of lower-cost shares, Defendant did not transfer Plan holdings in any of these funds from higher-priced share classes into the lowest-cost share classes, in breach of its fiduciary duties.

48.     There is no good-faith explanation for utilizing a high-cost share class when a lower-cost share class is available for the exact same investment. The Plan did not receive any additional services nor benefits based on its selection of more

expensive share classes; the only consequence was higher costs for Plan participants.

49.     The holders of different share classes identified above held the same investments and were subject to the same restrictions concerning deposits and withdrawals.  The only difference between share classes was that the lower-cost share classes were available only to Plans that had larger investments—but in all cases, the Quest Plan, as a billion dollar-plus plan for the entirety of the Class Period, was large enough to qualify for the lower cost share class.

50.     Named Plaintiff is *not* arguing that Defendant had a duty to scour the market to find and offer any cheaper investment. Instead, Plaintiff alleges that simply that lower cost funds with the identical managers, investments styles, and stocks" should have been considered by the Plan, particularly as it relates to the thirteen (13) Fidelity Target Date Funds.

51.     The Plan is comprised of a very large asset pool totaling in excess of 5 billion dollars.  Mega retirement plans, such as the Quest 401(k) Plan, have the ability to utilize institutional (or inexpensive) shares instead of retail shares.  Here, from 2015 through even today, the Plan's Fidelity Target Date Funds included only the needlessly more expensive share classes of those funds, despite less expensive versions of the same funds, managed by the same people, and with the same return on investment, having been available for years.

52.     Defendant's failure to take advantage of the cheaper share classes in at least sixteen (16) core investment on the Plan's menu, which also constitute the Plan's designated default investment option, materially decreased the value of the Plan and, in turn, Plaintiff's and all putative class members' retirement savings. Such allegations permit the reasonable inference that Defendant failed to exploit the advantages of being a mega retirement plan that could use scale to provide substantial benefits to its participants.

### ***Defendant Breached Its Fiduciary Duties By Including Fidelity Freedom Active Suite Target Date Funds Rather Than Passively Managed Funds***

53.     As detailed above, the Plan menu consists largely of the Fidelity Freedom Active Suite of Funds (the "Active Suite"). The Active Suite offers thirteen target-date funds, which are actively managed funds that shift the fund's asset allocation over time according to its "glide path."  For example, as an investor gets closer to retirement, the target-date fund will increase the portfolio's holdings in bonds and decrease the portfolio's holdings in securities to decrease risk.

54.     The Active Suite also serves as the Plan's "Qualified Default Investment Alternative (QDIA)," which means that new contributions were automatically directed to the Active Suite unless the participant directed the contributions to other funds.

55.     Largely because of the Active Suite's status as the QDIA, it holds much of the Plan's total assets.

56.     Defendant breached its fiduciary duties by continuing to offer the Active Suite to participants, even though it is both riskier and more expensive than alternatives – specifically, the Active Suite's Index fund counterpart, the Fidelity Freedom Index funds (the "Index Suite").

57.     The main difference between the two suites is that the Index Suite includes only Fidelity mutual funds that track market indices, whereas the Active Suite invests predominantly in actively managed funds to try to outperform the market indices. Notably, each Suite's glide path demonstrates both the Active and Index suites follow essentially the same strategy, given that each Suite's allocation of equities versus bonds follows the same pattern.

58.     However, because it is actively managed, the Active Suite charges more fees and has a higher expense ratio than the Index Suite. For example, the Institutional Premium share class for each target year of the Index Suite (the baseline fund) had an expense ratio of only 0.08%, while the K share of the Active suite had expense ratios ranging from 0.42% to 0.65%.

59.     Despite active management, the Active Suite has underperformed the index benchmarks.  On the other hand, the Index Suite outperformed the Active Suite in four out of the six years beginning in 2014 and continuing through 2020.[3]

---

[3] A March 2018 Reuters special report on the Fidelity Freedom funds (the "Reuters Report") details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk. *See* "Special Report: Fidelity puts 6

60.     Additionally, each Index Suite fund bears an equal or higher rating by Morningstar – an industry analyst – than its Active Suite counterpart.  Apart from three (the Income, 2005, and 2060 iterations), every single one of the thirteen funds in the Index Suite received a full five-star rating from Morningstar.  In contrast, not even one of the thirteen funds in the Active Suite has a five-star rating, and only one has a four-star rating.

61.     Likely because of the Active Suite's poor performance, many asset managers have withdrawn their investments in the Suite. For example, in 2018, the Suite experienced an estimated $5.4 billion in net outflows. In the four years prior to 2018, the Active Suite saw nearly $16 billion in total withdraws. At the same time, the Index Suite has seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone.

62.     Unfortunately, despite other asset managers recognizing the Active Suite's poor performance when compared to the Index Suite, Defendant did not. Instead, Defendant continued offering the Active Suite – and continue using it as the Plan's default option – even through the filing date of this lawsuit.

63.     Additionally, it's also worth noting that Active Suite Fidelity Freedom Funds have recently been the subject of many retirement plan class action lawsuits,

---

million savers on risky path to retirement", https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement.

further demonstrating why a prudent fiduciary would remove such risky and costly funds from an investment lineup. *See, e.g., Garthwait v. Eversource Energy Co*., No. 3:20-CV-00902 (JCH), 2022 WL 3019633, at \*19 (D. Conn. July 29, 2022) (denying motion for summary judgment in ERISA retirement plan case alleging breach of fiduciary duty by employer due, in part, to inclusion of Active Suite Fidelity Freedom Funds); *see also Boley v. Universal Health Servs., Inc*., 337 F.R.D. 626, 631-636 (E.D. Pa. 2021) (granting motion for class certification in case asserting claims related to Active Suite Fidelity Freedom Funds); *In re Omnicom ERISA Litig.*, No. 20-cv-4141 (CM), 2021 WL 392487 (S.D.N.Y. Aug. 2, 2021) (denying motion to dismiss breach of fiduciary duty claim based on retention of the Active Suite Fidelity Freedom Funds over the Index Suite); *In re: Prime Healthcare ERISA Litig.*, No. 8:20-cv-01529-JLS-JDE, 2021 WL 3076649 (C.D. Cal. July 16, 2021) (same); *In re Biogen, Inc. ERISA Litig.*, No. 20-cv-11325-DJC, 2021 WL 3116331 (D. Mass. July 22, 2021) (same); *In re Quest Diagnostics Inc. ERISA Litig.*, No. 20-07936-SDW-LDW, 2021 WL 1783274 (D.N.J. May 4, 2021) (same); *Blackmon v. Zachary Hldgs.*, No. 5:20-cv-988-DAE, 2021 WL 2190907 (W.D. Tex. Apr. 22, 2021) (same); *Jones v. Coca-Cola Consol., Inc.*, No. 3:20-cv-00654-FDW-DSC, 2021 WL 1226551 (W.D.N.C. Mar. 31, 2021) (same); *In re MedStar ERISA Litig.*, No. RDB-20-1984, 2021 WL 391701 (D. Md. Feb. 4, 2021) (same).

64.    For these reasons, Defendant's inclusion of the Active Suite in the Plan demonstrates imprudent Plan management in breach of its fiduciary duties under ERISA.

65.    Finally, significantly better performing lower price target date funds are widely available with significantly lower expense ratios.

66.    For example, Vanguard offers essentially the same (but better performing) target date funds with much lower expense ratios:

| Fidelity Option | Fidelity Ticker | Expense Ratio for Fidelity Fund | Name of Vanguard Target Date Fund | Vanguard Ticker | Expense Ratio for Vanguard Fund |
|---|---|---|---|---|---|
| Fidelity Freedom 2005 Fund Class K | FSNJX | **0.42%** | Vanguard Institutional Target Retirement 2005-2010 Fund Institutional Shares | VITRX | **0.09%** |
| Fidelity Freedom 2010 Fund Class K | FSNKX | **0.46%** | Vanguard Institutional Target Retirement 2005-2010 Fund Institutional Shares | VITRX | **0.09%** |
| Fidelity Freedom 2015 Fund Class K | FSNLX | **0.49%** | Vanguard Institutional Target Retirement 2015 Fund Institutional | VITVX | **0.09%** |

| | | | Shares | | |
|---|---|---|---|---|---|
| Fidelity Freedom 2020 Fund Class K | FSNOX | **0.53%** | Vanguard Institutional Target Retirement 2045 Fund Institutional Shares | VITWX | **0.09%** |
| Fidelity Freedom 2030 Fund Class K | FSNQX | **0.60%** | Vanguard Institutional Target Retirement 2030 Fund Institutional Shares | VTTWX | **0.09%** |
| Fidelity Freedom 2035 Fund Class K | FSNUX | **0.63%** | Vanguard Institutional Target Retirement 2035 Fund Institutional Shares | VITFX | **0.09%** |
| Fidelity Freedom 2040 Fund Class K | FSNVX | **0.65%** | Vanguard Institutional Target Retirement 2040 Fund Institutional Shares | VIRSX | **0.09%** |
| Fidelity Freedom 2045 Fund Class K | FNSZX | **0.65%** | Vanguard Institutional Target Retirement 2045 Fund Institutional Shares | VITLX | **0.09%** |
| Fidelity Freedom 2050 Fund Class K | FSNBX | **0.65%** | Vanguard Institutional Target Retirement | VTRLX | **0.09%** |

| | | | 2050 Fund Institutional Shares | | |
|---|---|---|---|---|---|
| Fidelity Freedom 2055 Fund Class K | FNSDX | **0.65%** | Vanguard Institutional Target Retirement 2055 Fund Institutional Shares | VIVLX | **0.09%** |
| Fidelity Freedom 2055 Fund Class K | FNSDX | **0.65%** | Vanguard Institutional Target Retirement 2055 Fund Institutional Shares | VIVLX | **0.09%** |
| Fidelity Freedom 2060 Fund Class K | FNSFX | **0.65%** | Vanguard Institutional Target Retirement 2060 Fund Institutional Shares | VILVX | **0.09%** |
| Fidelity Freedom 2065 Fund Class K | FSNDX | **0.65%** | Vanguard Institutional Target Retirement 2065 Fund Institutional Shares | VLXVX | **0.09%** |

67.     Defendant's failure to obtain reasonably-priced and properly performing investments is further evidence of its imprudent process to review and control the Plan's costs and is further indicia of Defendant's breaches of its fiduciary duties.

## FIRST CLAIM FOR RELIEF
### *Breaches of Fiduciary Duties of Prudence*

68.     Plaintiff re-alleges and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

69.     As a fiduciary of the Plan, Defendant is/was subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

70.     Defendant breached its fiduciary duties in multiple respects as discussed throughout this Complaint. Defendant failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

71.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

72.     Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendant is liable to restore to the Plan all losses caused by its breaches of fiduciary duties, and must

restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendant's breaches as set forth in the Prayer for Relief.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

1.      Find and declare that the Defendant breached its fiduciary duties as described above;

2.       Find and adjudge that Defendant personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.      Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.      Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plan under §1109(a);

5.      Remove fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.      Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper,

excessive and/or in violation of ERISA;

7.      Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.      Certify the Class, appoint the Plaintiff as class representative, and appoint her counsel as Class Counsel;

9.      Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.     Order the payment of interest to the extent it is allowed by law; and

11.     Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 10th day of January 2023.

Respectfully submitted,

*/s/ Andrew Frisch*
**ANDREW FRISCH**
NJ Bar No.: 038452000
8151 Peters Road, 4th Floor
Plantation, FL 33324
Telephone: 954-318-0268
Email: afrisch@forthepeople.com

-and-

**MARC R. EDELMAN** (pro hac vice forthcoming)
Florida Bar Number: 0096342
Morgan & Morgan, P.A.
201 N. Franklin St.
7th Floor
Tampa, FL 33602
Main: 813.223.5505

Direct: 813.577.4722
Email:  medelman@forthepeople.com

*/s/ Brandon J. Hill*

**BRANDON J. HILL** (*pro hac vice forthcoming*)
Florida Bar Number: 37061
**LUIS A. CABASSA** (*pro hac vice forthcoming*)
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK** (*pro hac vice forthcoming*)
Florida Bar Number: 0285020
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Direct: 813-337-7992
Main: 813-224-0431
Facsimile: 813-229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

**MICHAEL C. MCKAY** (*pro hac vice forthcoming*)
**MCKAY LAW, LLC**
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mckay@mckay.law